UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

ALZAL CORP.,

                              Plaintiff,

      -against-

I.F.C. INTERNATIONAL FREIGHT CORP.,
METROPOLITAN SHIPPING LOGISTICS CO.,
and ULTIMATE BODY AND TRANSPORT, INC.,

                             Defendants.

**MEMORANDUM AND ORDER**

13-CV-2577 (PKC) (JO)

----------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

On April 29, 2013, Plaintiff Alzal Corp. ("Alzal") initiated this action against Defendants IFC International Freight Corp. ("IFC"), Metropolitan Shipping Logistics ("Metropolitan"), and Ultimate Body and Transport Inc. ("Ultimate") for an alleged breach of a maritime contract to transport a 2008 Mercedes Benz 4W GL5, and seeking punitive damages. Metropolitan and Ultimate, who were served with the Second Amended Complaint in April 2014 (*see* Dkts. 33−34), have not appeared in this case. On July 7, 2014, IFC moved to dismiss the action under Rules 12(b)(1) and (b)(6). (Dkts. 36−39.) Because Alzal has failed to establish its standing as the proper party to bring this suit, IFC's motion is granted and the case is dismissed.

## *BACKGROUND*

The following facts are taken from Alzal's Second Amended Complaint, and exhibits thereto. (Dkt. 24 ("SAC").)

On or around May 2008, non−party Auto Point Ltd. ("Auto Point") purchased a 2008 Mercedes Benz 4W GL5 bearing the vehicle identification number ("VIN") 4JGBF86E68A417133 (the "Vehicle") for $80,550.00. (SAC ¶ 6 & Ex. 7.) Auto Point

subsequently sold the Vehicle to non−party Novruz Zeynalov ("Zeynalov") for shipment overseas to Baku, Azerbaijan. (*Id.* ¶ 8.) On or before June 18, 2008, Ilya Igdalev ("Igdalev"), allegedly acting as a representative of Auto Point, delivered the Vehicle to Metropolitan, a shipping broker in New Jersey. (*Id.* ¶¶ 8, 21, 25.) Attached to the Second Amended Complaint is a copy of a Metropolitan warehouse receipt dated June 18, 2008, reflecting that Metropolitan received the Vehicle. (*Id.* Ex. 1.) The receipt lists Zeynalov as both the "Shipper" and "Consignee." (*Id.*) Alzal alleges that Igdalev contracted with Metropolitan on behalf of Auto Point to ship the Vehicle to Zeynalov in Azerbaijan, citing as evidentiary support a Metropolitan shipping form, which names Zeynalov as both "Shipper" and "Consignee." (*Id.* ¶ 9 & Ex. 2.) Metropolitan generated a payment receipt, dated June 19, 2008, indicating that payments totaling $7,000.00 was received from Zeynalov, and that an outstanding balance of $7,300.00 remained. (*Id.* ¶ 10 & Ex. 3.) Metropolitan also issued an Invoice, dated June 19, 2008, stating that Zeynalov owed $6,000.00, due on July 4, 2008, for "Ocean Freight Service." The invoice was stamped "PAID." (*Id.* ¶ 11 & Ex. 4.)

Alzal alleges that upon payment, "Metropolitan became a bailee for the [V]ehicle." (*Id.* ¶ 11.) The Second Amended Complaint also states that Metropolitan transferred the Vehicle to IFC in Brooklyn for shipment and that IFC, through its acceptance of the Vehicle from Metropolitan, "created a constructive bailment between Auto Point Ltd. and I.F.C." (*Id.* ¶ 12; *see id.* ¶¶ 21, 25.) Alzal alleges, however, that "the assignment was illegal because no title documents accompanied the [V]ehicle and IFC as a shipping agent should have known this." (*Id.* ¶ 25.) Metropolitan, through IFC as its "shipping agent," thereafter shipped the Vehicle out of the country without proper title documents. (*Id.* ¶ 12.) According to Alzal, IFC "knew or

should have known that it was illegal to ship a vehicle out of the United States without proper transport documents." (*Id.* ¶ 13.)

Because the Vehicle was shipped without proper title documents, United States Customs officials seized the Vehicle in Europe and returned it to the United States. (*Id.* ¶¶ 12, 21−22 & Ex. 5.) Alzal alleges that Metropolitan and IFC refused to return the Vehicle to Auto Point or Igdalev, who demanded its return. (*Id.* ¶¶ 14, 19−20, 22.) Instead, Metropolitan and IFC gave the Vehicle to Ultimate for body and fender repairs. (*Id.* ¶ 16.) Ultimate later filed a notice claiming a lien for work performed on the Vehicle. (*Id.* ¶ 17 & Ex. 6.) Alzal states that it has no knowledge of the current whereabouts of the Vehicle, and claims that IFC, Metropolitan, and Ultimate engaged in the course of conduct described above in a conspiracy to deprive Auto Point of the Vehicle. (*Id.* ¶¶ 18, 22, 26.)

Alzal alleges that it is the "successor in interest" to Auto Point's claim to the Vehicle. (*Id.* ¶¶ 14, 24, 26, 31.) Alzal explains that after Auto Point was adjudged bankrupt on June 19, 2013, the trustee in bankruptcy "relinquished all claim to the [V]ehicle[.]" (*Id.* ¶ 7.) "[H]ence the title was subsequently assigned to the plaintiff and the plaintiff is presently the owner of the [] [V]ehicle." (*Id.*)

## DISCUSSION

### I. Legal Standard

IFC brings this motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and pursuant to Rule 12(b)(6), for failure to state a claim. A claim must be dismissed under Rule12(b)(1) for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a 12(b)(1) motion to dismiss for lack of

subject matter jurisdiction, "the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," *id.* (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (internal marks omitted)), in which case, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists'" *id.* (quoting *Makarova*, 201 F.3d at 113).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint for a plaintiff's failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In evaluating a 12(b)(6) motion to dismiss, a district court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 521 (2d Cir. 2006). The liberal notice pleading standard of Rule 8(a) only requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly*, 550 at 555. Under Rule 8(a)(2), the complaint need not set forth "detailed factual allegations," but the plaintiff must present "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 555 U.S. at 557). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative

4

level[.]" *Twombly*, 550 at 555. A complaint should be dismissed where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible[.]" *Id.* at 570.

**II.     Subject Matter Jurisdiction**

**A.  Federal Maritime Jurisdiction**

Alzal's Second Amended Complaint alleges that subject matter jurisdiction exists under 28 U.S.C. § 1333 as a maritime contract claim, and under 28 U.S.C. § 1337 as an action arising under an Act of Congress regulating commerce. (SAC ¶ 4.) Since Alzal fails to identify any Act of Congress that gives rise to its claims, federal jurisdiction over this action is dependent on whether Alzal can establish that the shipping agreements at issue constitute maritime contracts.

Federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction . . . " 28 U.S.C. § 1331(1). This jurisdictional grant extends to contracts "which relate to the navigation, business, or commerce of the sea." *Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d 34, 36 (2d Cir. 1994) (citations omitted); *see Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) (a federal action can "be sustained under the admiralty jurisdiction by virtue of the maritime contracts involved"). The determination of whether maritime jurisdiction exists over a contract turns on "the nature and character of the contract" and whether the contract has "reference to maritime service or maritime transactions." *Kirby*, 543 U.S. at 24; *see Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961).

In *Kirby*, a seller of machinery entered into two bills of lading with a freight−forwarding company for the transportation of machinery from Australia to Alabama over both land and sea. 543 U.S. 18−20. Looking to the "nature and character of the [bills of lading]" at issue, the Supreme Court held that they constituted "maritime contracts because their primary objective is

5

to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States." *Id.* at 24.

Similarly, here, the primary objective of the shipping agreement at issue was to transport the Vehicle from the United States to Azerbaijan by ocean freight, and that agreement was governed by IFC's bill of lading. (*See* Dkt. 39 ("Def. Mem.") at 6−7 (contending that any contractual relationship regarding the shipment of the Vehicle "would be governed by IFC's standard bill of lading terms").) The agreement to ship the Vehicle, which encompasses IFC's bill of lading, therefore is a maritime contract that confers federal subject matter jurisdiction over this action. *See also Asoma Corp. v. SK Shipping Co., Ltd.*, 467 F.3d 817, 823 (2d Cir. 2006) ("Charter parties and bills of lading are interpreted using the ordinary principles of maritime contract law."); *Aston Agro−Indus. AG v. Star Grain Ltd.*, No. 06 CV 2805 (GBD), 2006 WL 3755156, at *3 (S.D.N.Y. Dec. 20, 2006) (contracts between seller and purchaser of wheat were "not maritime contracts because their primary objective was not the transportation of goods by sea. Instead, their primary objective was, undoubtably, the sale of wheat"; by contrast, "charter parties to accomplish the shipment of the wheat[]" are maritime contracts because "it was the primary maritime objective of *those* contracts to transport the wheat by sea" (emphasis in original)).

IFC contends that "the alleged facts giving rise to Alzal's loss of the Vehicle are too attenuated to the business of maritime commerce to implicate admiralty and maritime jurisdiction." (Def. Mem. at 6.) The Court disagrees.

Under the Second Circuit's threshold inquiry,[1] a dispute will not give rise to maritime jurisdiction if "'the *subject matter of the dispute* is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction.'" *Folksamerica*, 413 F.3d at 312 (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 200 (2d Cir. 1992)) (emphasis in *Folksamerica*). The Second Circuit held in two cases that disputes involving insurance claims for coffee lost from a warehouse in Mexico was too attenuated from the business of maritime commerce, because the subject matter of the dispute—coffee—had no inherent maritime character, was never designated for ocean transport, and never entered maritime commerce. *See In re Balfour MacLaine Int'l Ltd.,* 85 F.3d 68, 75 (2d Cir. 1996); *Atl. Mut. Ins.*, 968 F.2d at 200; *see also Folksamerica*, 413 F.3d at 312 (stating that "[c]offee lost from a Mexican warehouse clearly has little to do with the business of maritime commerce" (internal quotation marks omitted)). In contrast to the coffee involved in the *Atlantic Mutual* and *Balfour* cases, here, the Vehicle was in fact shipped through maritime commerce and failed to reach its ultimate destination because of alleged deficiencies in IFC's handling of the shipment, namely the failure to ensure that the Vehicle was accompanied by proper title documents. After the Vehicle was seized by U.S. Customs officers in Europe, Alzal essentially alleges that IFC then mishandled the return shipment of the Vehicle by failing to ensure its release to its owner. Thus, construing the factual allegations in the light most

---

[1] Prior to the Supreme Court's ruling in *Kirby*, the Second Circuit required a "threshold inquiry" into "the subject matter of the *dispute*" to determine "whether an issue related to maritime interests has been raised." *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*, 413 F.3d 307, 312 (2d Cir. 2005) (citation and internal quotation marks omitted) (emphasis in original). The *Kirby* decision, however, made no mention of a threshold inquiry, casting into doubt whether this inquiry survives *Kirby*. *See id.* at 313−14 ("We simply highlight this discrepancy and leave for a more appropriate case the question of how [*Kirby*] might circumscribe our 'threshold inquiry' doctrine, if at all."). Because, as discussed *infra*, the subject matter of this case satisfies the threshold inquiry, the question of the continued viability of the inquiry need not be addressed.

favorable to Alzal, a claim arising out of IFC's failure to properly ship the Vehicle by sea has more than a "speculative and attenuated" connection to maritime commerce.

The Court turns next to the question of whether Alzal may assert rights under the relevant maritime shipping contract. As discussed below, Alzal cannot establish the requisite standing to bring this action.

### B. Standing

IFC additionally moves to dismiss this action on the ground that Alzal lacks standing. (Def. Mem. 1−2.) Standing is a limitation on federal court jurisdiction, and may be raised *sua sponte* by the Court. *See Central States SE and SW Areas Health and Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005); *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994). "In order to ensure that this 'bedrock' case−or−controversy requirement is met, courts require that plaintiffs establish their 'standing' as 'the proper part[ies] to bring' suit." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997))

Standing comprises three elements: injury−in−fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *accord Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union free Sch. Dist.*, 478 F.3d 494, 499 (2d Cir. 2007). These "are not mere pleading requirements but rather an indispensable part of the plaintiff's case[.]" *Defenders of Wildlife*, 504 U.S. at 561 (citations omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *id.*, because on a motion to dismiss, the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Nonetheless, a plaintiff "cannot rely solely on conclusory allegations of injury or ask the court to

8

draw unwarranted inferences in order to find standing." *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003). As is the case with other jurisdictional inquiries, standing "cannot be 'inferred argumentatively from averments in the pleadings,' . . . but rather 'must affirmatively appear in the record.'" *Thompson*, 15 F.3d at 247 (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). As the Second Circuit has observed, "like many cases under 12(b)(1) (but not under 12(b)(6)), it may become necessary for the district court to make findings of fact to determine whether a party has standing to sue." *Rent Stabilization Ass'n of City of N.Y. v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993).

Alzal lacks the requisite injury to establish standing for two reasons. First, Alzal has no legally protected interest in the Vehicle, having never received a valid assignment from Auto Point. Second, even taking as true Alzal's unsupported contention that it succeeded to Auto Point's interest in the Vehicle, Alzal's allegations and exhibits to its pleading do not permit an inference that Auto Point was a party to a contract with IFC.

1. Alzal's Standing as Successor to Auto Point

Since Alzal was not involved in the transactions at issue in this action, Alzal's claims depend on its ability to establish its right to the Vehicle as a successor in interest to Auto Point. Alzal asserts in this regard that after Auto Point "was adjudged bankrupt on June 19, 2013," Auto Point's trustee in bankruptcy "relinquished all claim to the [V]ehicle . . . hence the title was subsequently assigned to [Alzal] and [Alzal] is presently the owner of the subject [V]ehicle and as a result able to prosecute this lawsuit." (SAC ¶ 7.) As an initial matter, since "standing is to be determined as of the commencement of suit," *Fenstermaker v. Obama*, 354 Fed. App'x. 452, 455 n.1 (2d Cir. 2009) (quoting *Defenders of Wildlife*, 504 U.S. at 571 n.5), Alzal's allegation that Auto Point assigned its interest to the Vehicle after the closure of the bankruptcy proceeding

on June 19, 2013 essentially establishes that Alzal did not have standing when it filed its original complaint on April 29, 2013. *See Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 0722 (PAE), 2012 WL 4849146, at *4 (S.D.N.Y. Oct. 12, 2012) ("courts cannot consider any amendments to the initial complaint or any post−filing assignments to plaintiffs to determine whether plaintiffs have standing") (citing *Fenstermaker*, 354 Fed. App'x. at 455 n.1).

Moreover, contrary to Alzal's contention, Auto Point had relinquished its right to the Vehicle during bankruptcy proceedings and thus its trustee did not retain an interest in the Vehicle that could be "assigned" to Alzal. Publicly available records of Auto Point's proceedings in the United States Bankruptcy Court, District of Minnesota, of which this Court takes judicial notice,[2] indicate that the case was closed with all scheduled assets—including a 2008 Mercedez with the same VIN as the Vehicle—liquidated and distributed to creditors. Specifically, on May 26, 2010 Auto Point's trustee in bankruptcy filed a Schedule of Personal Property listing a 2008 Mercedes with the same VIN as the Vehicle under the category for automobiles, with a value of $60,000. *See In re Auto Point, Ltd.*, No. 10−43005 (Bankr. D. Minn. May 26, 2010).[3] Almost three years later, Auto Point's trustee submitted a "Final

---

[2] District courts may take judicial notice of filings in underlying bankruptcy proceedings. *See Meney v. Seterus*, Inc., No. 13−CV−6149T, 2014 WL 1516583, at *4 (W.D.N.Y. Apr. 17, 2014); *Dev. Specialists, Inc. v. Dechert LLP*, No. 11 Civ. 5984 (CM), 2013 WL 4573733, at *3 n.5 (S.D.N.Y. Aug. 22, 2013); *see also In re Old Carco LLC*, 509 F. App'x 77, 79 (2d Cir. 2013) (lower courts permitted to take judicial notice of the $11.6 billion intercompany debt noted in the bankruptcy filings); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (courts may take judicial notice of court filings to establish that certain matters have been publicly asserted, not for the truth of the matters asserted therein). As noted above, a court resolving a motion to dismiss for lack of subject matter jurisdiction "may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113. Here, the Court additionally notified the parties of its intention to review the docket in Auto Point's bankruptcy matter. (*See* Minute Order, dated Feb. 19, 2014).

[3] Despite the fact that IFC included this document in its motion submissions, (Dkt. 37, Ex. 3 at 21), IFC curiously devotes a significant portion of its motion papers to its contention that "Auto

Account And Distribution Report," indicating that "[t]he case is fully administered and all assets and funds which have come under the trustee's control in this case have been properly accounted for as provided by law." *See In re Auto Point, Ltd.*, No. 10−43005, Dkt. 49 at 1 (Bankr. D. Minn. May 2, 2013). An "Individual Estate Property Record and Report" form attached to the Final Account and Distribution Report lists a 2008 Mercedes with the same VIN as the Vehicle, as an asset that was "fully administered." (*Id.* at 10.) In addition, prior to filing its Second Amended Complaint, Alzal filed a letter attaching e−mail correspondence between his attorney and the Auto Point trustee, in which the trustee confirmed that the bankruptcy "case was closed because the assets that were property of the bankruptcy estate were liquidated and the distributions to creditors completed." (Dkt. 20 Att. at 4.)

These filings suggest that Auto Point represented in its bankruptcy proceedings that the Vehicle was an asset included in its estate that was liquidated to satisfy its creditors. Auto Point thus did not retain an interest in the Vehicle that it could have "assigned" to Alzal, and Alzal cannot act as a "successor in interest" to Auto Point with respect to the Vehicle. *See In re Century/ML Cable Venture*, 311 F. App'x 455, 456-57 (2d Cir. 2009) (purported successor in interest of creditor lacked standing to pursue creditor's alleged breach of contract claim, where assignment of creditor's claim against debtor did not occur until after creditor's forfeiture of all its assets). These records accordingly preclude the Court from drawing an inference that Alzal succeeded in Auto Point's interest in the Vehicle.[4]

---

Point failed to list in its bankruptcy schedules as an asset any claim it had in relation to its alleged loss of the Vehicle" (Def. Mem. at 8).

[4] Indeed, as Auto Point and Alzal are both controlled by Igdalev, allowing Alzal to pursue a claim as to the Vehicle in this action may serve to end−run the Auto Point bankruptcy proceedings.

### 2. Alzal's Standing to Assert Claims Related to the Shipping Contracts

Even assuming *arguendo* that Alzal is the successor to Auto Point's claims regarding the Vehicle, Alzal's claim nevertheless fails because Alzal has not alleged facts sufficient to support the existence of an enforceable contract between Auto Point and IFC. In New York, "privity is essential to a contract claim." *Rexo Imports LLC v. Brighton Ford, Inc*, No. 14−CV−6037−FPG, 2015 WL 500488, at *3 (W.D.N.Y. Feb. 4, 2015) (citing cases); *CDJ Builders Corp. v. Hudson Grp. Const. Corp.*, 889 N.Y.S.2d 64, 65 (N.Y. App. Div. 2009) ("Liability for breach of contract does not lie absent proof of a contractual relationship or privity between the parties." (quoting *Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 112 (N.Y. App. Div. 2009))). Generally, "a nonsignatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *In re Cavalry Const., Inc.*, 428 B.R. 25, 30 (S.D.N.Y. 2010) (quoting *Crabtree v. Tristar Auto. Grp., Inc.*, 776 F.Supp. 155, 166 (S.D.N.Y. 1991)), *aff'd* 425 F. App'x 70 (2d Cir. 2011);

Alzal's Second Amended Complaint is bereft of any factual support for its assertion that Auto Point and IFC entered into a contractual agreement concerning the Vehicle. Alzal alleges that "Igdalev on behalf of Auto Point [] contracted with Metropolitan to ship th[e] [V]ehicle" and that the shipping form "establishes a maritime contract by and between the parties." (SAC ¶ 9.) With respect to IFC, Alzal alleges only that "[w]ith I.F.C. accepting the [V]ehicle from Metropolitan for shipping[,] this created a constructive bailment between Auto Point [] and I.F.C." (*Id.* ¶ 12.) Absent from the pleading is any allegation that IFC knew about Auto Point. More significantly, Alzal fails to allege that either Auto Point or Alzal were signatories to the contract. Nor could it, as the warehouse receipt, shipping form, payment receipt, and invoice referenced in and appended to the Second Amended Complaint all reflect agreements and

payments only between *Zeynalov*, the overseas purchaser of the Vehicle, and *Metropolitan*. (*See* SAC ¶¶ 9−11 & Exs. 1−4.)[5] Neither Auto Point nor its alleged representative, Igdalev, appear anywhere in these documents. IFC likewise is conspicuously absent from these documents. Alzal's unsupported and conclusory allegations that "Metropolitan became a bailee" of the Vehicle and that IFC entered into a "constructive bailment" thus are insufficient to plead that Auto Point was in privity of contract with IFC. Accordingly, Alzal has failed to show that it is the proper party to pursue claims regarding the Vehicle.[6]

## CONCLUSION

For the foregoing reasons, IFC's motion is granted on the basis that Alzal has failed to sufficiently establish standing to bring this action. The Second Amended Complaint is dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The Clerk of Court is respectfully requested to close the case.

SO ORDERED:

/s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: March 23, 2015
      Brooklyn, New York

---

[5] In an apparent attempt to explain Auto Point's absence in the shipping documents, Alzal submitted an affidavit from Igdalev as part of its opposition to IFC's motion, stating that Igdalev and Zeynalev had an "understanding" that Zeynalev would pay the costs of shipping the Vehicle and Igdalev would make the shipping arrangements. (Dkt. 40 ¶ 5.) This factual assertion, even if true, does not alter the result here, since, on its face, it does not establish that Metropolitan, much less IFC, contracted with *Auto Point*, as opposed to Zeynalev, with respect to the shipping of the Vehicle. (*See* SAC ¶ 9 & Ex. 2.)

[6] Having thus found, the Court need not reach IFC's other contentions, *i.e.*, that Alzal's claim is time−barred under IFC's bill of lading (Def. Mem. at 3, 6−7), that IFC's actions were justified (*id.* at 2−3), and that Alzal may not recover punitive damages (*id.* at 7).